[No. 22005–5–I. Division One. August 14, 1989.]

THE STATE OF WASHINGTON, *Respondent,* v. ROBERT ALLEN WILBER, *Appellant.*

*Julie A. Kesler* and *Dawn Monroe* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Anthony D. Shapiro, Deputy,* for respondent.

PEKELIS, J.—Robert Wilber appeals from the trial court's admission of the opinion testimony of two police officers in his trial for burglary in the second degree. We affirm.

During the night of March 12, 1987, Richard Breen was awakened by the sound of breaking glass. He got up and found a man in his kitchen. He chased the man out of his house, but lost sight of him when he jumped over a hedge. Breen then saw a car with its lights on and motor running on the other side of the hedge. He got the license plate number of the car and called the police. He later discovered that a cord and some paintings were missing from his shed.

The police stopped the car described by Breen and arrested its four occupants, Christina Rogers, Rhonda Heassler, Scott Bartell, and David Hecht. Two different versions of what occurred that evening came out at trial.

According to the testimony of Rogers, Heassler and Bartell, they had spent the evening with Hecht and Wilber driving around and drinking beer. After nightfall, they stopped in Auburn and parked next to a hedge, where Hecht and Wilber got out of the car. Hecht walked to the garage of a nearby house while Wilber walked to the back of the house. Rogers heard the sound of glass breaking and Heassler saw someone chasing Hecht, who ran back to the car. They then saw Hecht place an extension cord and a canvas painting in the back of the car. Bartell got out of the

car to tell Hecht he wanted to leave and saw a man in underwear chasing Wilber. Hecht and Bartell then got back into the car and drove off, leaving Wilber behind.

Contrary to this testimony, Wilber testified that Hecht let him out of the car in Auburn sometime before the burglary occurred. He intended to walk home to Sumner, but mistakenly walked in the wrong direction and got lost. The police officer who responded to Wilber's call for assistance testified that Wilber appeared intoxicated and had a fresh cut on one of his hands. At this point, Wilber had not been linked to the burglary, and the officer helped him obtain transportation home.

Hecht's version of what happened changed from the time of his arrest to the time of Wilber's trial. In a statement made at the time of his arrest, Hecht stated that he stopped by the hedge because Wilber asked him to stop the car. When Wilber got out of the car and walked toward a garage, Hecht followed him. Wilber then handed him a cord and a painting and told him to put them into the back of the car.

The arresting officer testified that Hecht was initially reluctant to sign a written statement and that Hecht said he was afraid of Wilber and concerned for his own safety. Hecht eventually did sign a written statement.

At trial, defense counsel informed the court that Hecht's story had changed substantially and that he would be testifying on Wilber's behalf. Over defense counsel's objection, the trial court ruled that Hecht's prior statement regarding Wilber could be used as rebuttal evidence after he had testified.

Hecht testified on direct examination that he let Wilber out of the car before driving into Auburn, where he pulled up next to a hedge and let Bartell out to urinate. When Bartell did not return, Hecht got out to look for him. Bartell then poked his head out of a garage and told Hecht to put an extension cord and a picture in the car. Hecht returned to the car where he heard a noise and saw Bartell running down the street. He drove around the block, picked

Bartell up and drove away. The car was stopped by the police shortly thereafter.

The State impeached Hecht with his prior inconsistent statement about the events of that evening. The State also elicited testimony from Hecht regarding a conversation he had with Detective Himple about 6 months after the burglary. In response to Himple's request that he view a photo montage, Hecht told Himple that Wilber was primarily responsible for the crime but that he did not want to identify Wilber because he was afraid of him. Hecht finally agreed to identify Wilber when Himple promised he would disclose this fact only if someone else also identified Wilber.

In addition to this impeachment testimony, the State presented two rebuttal witnesses, Officers Dina M. Paganucci and William H. Mitchell. Both testified that they had been given special training to enable them to determine whether or not someone was telling the truth. Over defense objection, the court allowed them to testify that, in their opinion, Hecht was telling the truth when he gave his original statement to the police.

Wilber contends that the testimony of Officers Paganucci and Mitchell was inadmissible expert testimony and an improper opinion on his guilt. The State contends that although admission of the officers' opinion testimony might have been improper, any error was harmless.

ER 704 permits a witness to give an opinion on an ultimate issue of fact: "Testimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, "[n]o witness, lay or expert, may testify to his opinion as to the guilt of a defendant, whether by direct statement or inference." *State v. Black,* 109 Wn.2d 336, 348, 745 P.2d 12 (1987). Such an opinion violates the defendant's right to a trial by an impartial jury and his right to have the jury make an independent evaluation of the facts. *State v. Carlin,* 40 Wn. App. 698, 700–01, 700 P.2d 323 (1985).

Testimony deemed to be an opinion as to a defendant's guilt must relate to the defendant. In *State v. Carlin,* 40 Wn. App. at 703, for example, a police officer's testimony that a police dog tracked the defendant by following a fresh "guilt scent" was held to be inadmissible opinion testimony. In *State v. Haga,* 8 Wn. App. 481, 490, 507 P.2d 159, *review denied,* 82 Wn.2d 1006 (1973), an ambulance driver testified that the defendant's reaction to news of his wife's death was unusually "calm and cool". The court concluded that the ambulance driver's testimony implied his opinion that the defendant was guilty. *Haga,* 8 Wn. App. at 492. Here, the testimony of Officers Paganucci and Mitchell was offered as expert testimony on the issue of a witness's (Hecht's) credibility, not Wilber's guilt or innocence. Arguably, the officers' opinions are also, inferentially, opinions on the defendant's guilt. However, to take such an expansive view of the prohibition against opinion testimony on the guilt of a defendant is unnecessary.[1] ER 702 was designed to address the admissibility of precisely this type of evidence. Thus, we do not analyze the testimony as an impermissible opinion as to defendant's guilt, but simply as expert testimony under ER 702.

 Under ER 702, a witness may not give an opinion as an expert unless, among other things, the opinion is based upon an explanatory theory generally accepted in the scientific community. *State v. Black,* 109 Wn.2d 336, 341, 745 P.2d 12 (1987).

Here, Officers Paganucci and Mitchell in essence testified as experts on a witness's veracity. Although the officers stated they had been trained to observe body and eye

---

[1]Moreover, confusion would likely result from extending the rule and thus blurring the distinction between prohibited opinion testimony and perfectly proper opinion testimony. The latter category is testimony relied on routinely by the State, such as a witness's opinion that the defendant is the person the witness saw commit the crime, or the fingerprint expert's opinion that the defendant's prints are the same as those on the crime weapon. Indeed, it is the very fact that such opinions imply that the defendant is guilty which makes the evidence relevant and material.

movements for evidence of falsification by a witness, they did not elaborate on the nature of this training or how the witnesses' movements demonstrated falsification. More importantly, there was no evidence that the officers' opinion as to the significance of Hecht's "body movement signs" was based on a theory generally accepted by the scientific community.

Washington courts have not yet accepted as reliable any "scientific" method for discerning the truthful from the untruthful. *See, e.g., State v. Woo,* 84 Wn.2d 472, 473, 527 P.2d 271 (1974); *State v. Ahlfinger,* 50 Wn. App. 466, 469–70, 749 P.2d 190 (polygraph tests are unreliable and therefore inadmissible at trial), *review denied,* 110 Wn.2d 1035 (1988). Nothing in the record before us suggests a valid reason for departing from this approach. We therefore conclude that the officers' purported "expert" opinions that Hecht was telling the truth when he made his original statement were inadmissible.

■ The State contends that the trial court may nonetheless be affirmed because the admission of the officers' testimony was harmless error. The erroneous admission of expert testimony under ER 702 is not of constitutional magnitude. *State v. Huynh,* 49 Wn. App. 192, 198, 742 P.2d 160 (1987), *review denied,* 109 Wn.2d 1024 (1988).[2] Thus, the error is not prejudicial unless, within reasonable probabilities, it materially affected the outcome of the trial. *Huynh,* 49 Wn. App. at 198.

We are persuaded that in this case, as improper and unnecessary as the testimony was, it could not possibly have affected the outcome of the trial. The jury properly received testimony that Hecht was afraid of Wilber and reluctant to identify him. Moreover, Hecht's trial testimony was completely inconsistent with his prior statement implicating Wilber. This prior statement was consistent with the

---

[2]Had the officers' testimony been an impermissible opinion on the defendant's guilt, the error would have been one of constitutional magnitude. *Carlin,* 40 Wn. App. at 703.

testimony of three other witnesses. Each of the three testified not only that Wilber was present at the burglary, but that he was primarily responsible for it. In short, Hecht had already been thoroughly impeached, and there was every indication that his earlier version of events was the correct one.[3] Thus, ironically, the State did not need to risk the introduction of these improper "expert" opinions. The jury had ample, more reliable, evidence before it. Thus, within reasonable probabilities, the admission of the officers' testimony was harmless error.

Affirmed.

SCHOLFIELD and WINSOR, JJ., concur.

---

[3]Aside from the witnesses who implicated Wilber, there was strong corroborating physical evidence: a window had been broken during the burglary and Wilber had a fresh cut on his hand the evening of the burglary.