[No. 21792-2-III. Division Three. September 21, 2004.]

THE STATE OF WASHINGTON, *Respondent*, v. DERRICK D. BARR, *Appellant*.

374

*Dennis W. Morgan*, for appellant.

*Gregory L. Zempel*, *Prosecuting Attorney*, and *Douglas R. Mitchell*, *Deputy*, for respondent.

KURTZ, J. — Derrick D. Barr was convicted of second degree rape, unlawful imprisonment, and second degree vehicle prowl. On appeal, Mr. Barr contends the trial court erred by admitting a police officer's testimony concerning the Reid Investigative Technique and by allowing the jury to view a videotape of Mr. Barr's interrogation. Mr. Barr also asserts that the prosecuting attorney committed misconduct during her closing argument and when eliciting opinion testimony related to Mr. Barr's credibility. Additionally, Mr. Barr contends he received ineffective assistance of counsel at trial. We conclude the admission of the officer's testimony regarding the Reid Investigative Technique and Mr. Barr's credibility constituted a manifest constitutional error that was not harmless. We reverse Mr. Barr's convictions because the trial court erred by admit-

ting testimony that constituted an impermissible opinion on Mr. Barr's guilt.

## FACTS

Derrick Barr was convicted of second degree rape, unlawful imprisonment, and vehicle prowl in the second degree. The incident occurred on May 24, 2002. The victim was A.J. A.J. and Mr. Barr did not know each other prior to May 24.

A.J. was taking a night class at Central Washington University. After her class, she met a female friend, Taylor Green, for dinner; later, the two women went to the Horseshoe Tavern in Ellensburg. Once there, the two women met Mr. Barr, who was at the Horseshoe with his friend, Mike Auvil.

Mr. Barr and A.J. both consumed alcohol during the course of the evening. Beginning with dinner, A.J. consumed approximately two shots, two beers, and two drinks. Mr. Barr ate dinner at Mr. Auvil's home. Beginning with dinner, Mr. Barr consumed approximately two vodka and cranberry juice drinks containing two or three shots each, five additional shots, two beers, and two mixed drinks.

Both Ms. Green and Mr. Auvil observed A.J. dancing with Mr. Barr. Ms. Green and Mr. Auvil also observed the couple kissing. They did not see Mr. Barr and A.J. leave the building. A.J. testified that she left the building because she could not locate Ms. Green. A.J. went to the Mint Bar, located across the street, because there had been an earlier discussion about going over to the Mint. Mr. Barr accompanied A.J.

Mr. Barr and A.J. crossed the parking lot and entered the back seat of a Honda Civic owned by Jennifer Richardson. Ms. Richardson was not acquainted with either A.J. or Mr. Barr. There are two different versions of what happened inside the Honda.

Mr. Barr testified that A.J. was the aggressor and it was her idea to have sex. According to Mr. Barr, A.J. undid his pants and performed oral sex on him. They then engaged in

vaginal sex and, thereafter, anal sex while A.J. was looking out the back window. Mr. Barr acknowledged that A.J. asked him to stop twice. Usually this was to change positions—but the last time she lost control of her bowels.

According to A.J., Mr. Barr was the aggressor. He threatened her, held her down, and put his hands on her throat. He told her that he had a knife and a gun. Mr. Barr undid her pants and pulled them partially down; her arms were pinned. While she was sitting on the back seat, he inserted his penis in her vagina. He had her get on her knees and there was both vaginal and anal penetration. A.J. was facing the back window and she banged on the rear window to attract attention. Mr. Barr then had her turn around and perform oral sex on him. Mr. Barr choked her and threatened her. Eventually, A.J. lost control of her bowels. When the opportunity arose, A.J. fled from the Honda.

A.J. was observed running down the street—naked from the waist down—banging on store windows. She was screaming and sobbing. When she saw a patrol car, she immediately ran to it, opened the rear door, and jumped in even before the vehicle had come to a stop. Deputy Jeffrey Doll, the officer driving the patrol car, described A.J. as extremely upset and hysterical. Eventually, she was able to provide the officer with information indicating that she had been sexually assaulted.

After A.J. fled from the Honda, Mr. Barr also ran from the area. Mr. Barr was observed throwing something into a nearby dumpster. He was not wearing a shirt. Eventually, he was located under a car several blocks away. He was identified by several witnesses, including A.J.

Officers located a shot glass necklace in the dumpster; Mr. Barr had been seen wearing the necklace earlier in the evening. A.J.'s pants, underwear, shoes, and Visa card were recovered from the back seat of the Honda. The back seat also had feces on it.

Mr. Barr was transported to the Ellensburg Police Department. He was informed of his *Miranda*[1] rights. Detective Lee Roe, Officer Brett Koss, and Officer Andrew Houck interviewed Mr. Barr at different times. The interviews were videotaped and the videotape was played at trial.

A.J. was taken to the hospital for an examination, which revealed abrasions and/or bruising on her neck, arms, legs, and her buttocks near her anus. A.J. also had a bite mark on her neck. Mr. Barr had scratches, dirt, and grime on his torso and pants, and feces on his chest and pants.

Mr. Barr was charged with first degree rape, unlawful imprisonment, and second degree vehicle prowl. After a jury trial, Mr. Barr was convicted of second degree rape, unlawful imprisonment, and vehicle prowl in the second degree. He appeals.

## ANALYSIS

*Reid Investigative Technique.* During his testimony, Officer Koss testified that he interviewed Mr. Barr at the police station. Officer Koss testified that he had been trained to use the Reid Investigative Technique that taught him to look for verbal and nonverbal clues that someone was being deceptive. Officer Koss's testimony indicated that he applied this training when interviewing Mr. Barr. The following exchanges took place during Officer Koss's direct testimony:

Q. Did you note any signs of deception when the defendant was being interviewed?

A. Yes. Yes, ma'am. What *I thought was deception,* one of the first things I noticed just in his contact with Detective Roe is he kept mentioning going to prison. Nobody had said that to him. He was just in an interview room at the station and that was a flag for me. *What I have been taught [by] some of these schools is people feel guilty and that they realize there is [sic] consequences and lots of times they'll verbalize those fears. So it was obvious to me he was afraid he was going to go to prison for this.*

---

[1] *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

He mentioned it at least twice to Detective Roe and to me, as well, in our interview.

Q. Any other signs?

Report of Proceedings (RP) (Dec. 11, 2002) at 80-81 (emphasis added).

Q. What about this swearing on your grandmother's grave type thing?

A. At one point he made a statement about swearing on his daughter's life or something like that and I called him on it in the tape, if you remember, you know, *that's one of the big flags like that and like the utterances about the thing going to prison, those are big flags when you see those things start to bunch together. You get an idea somebody is being deceptive.*

RP (Dec. 11, 2002) at 82 (emphasis added).

Q. What about the nonverbal cues?

A. One of the things I noticed and in watching the tape when he was talking to Detective Roe he was sitting like we are. As soon as I came in [and] started questioning his knees came up on the bench, his hands came in here and *that's a protective posture that we are taught to look for and they're protecting themselves.* They feel like they're under attack.

RP (Dec. 11, 2002) at 82-83 (emphasis added).

Q. Did he have any labored breath?

A. No, he wasn't huffing or puffing, the heaving. It seems disingenuous to me, didn't seem real.

Q. How about change in voice, inflextion [sic]?

A. There were times when I was pressuring him when I was trying that theme of being more direct with him, that he would react the same way, you know, he would hit the table. He would move out closer to me on the table and raise his voice as if he was upset, but then once we start talking again he would be right back down. *Again, it didn't seem genuine to me. It didn't seem like if he was really feeling these emotions and that worked up he would be hitting the table and stuff.* He wouldn't have these ups and downs so quickly.

RP (Dec. 11, 2002) at 84 (emphasis added).

■ On appeal, Mr. Barr points out that the Reid Investigative Technique has never been accepted as admissible evidence in Washington. Accordingly, he contends that Officer Koss's testimony constituted impermissible testimony as to Mr. Barr's guilt that invaded the province of the jury. Mr. Barr did not raise this issue with the trial court. An error may be raised for the first time on appeal if it is a manifest error involving a constitutional right. RAP 2.5(a)(3); *State v. McDonald*, 138 Wn.2d 680, 691, 981 P.2d 443 (1999) (quoting *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)).

■ We determine whether an error is a manifest constitutional error by applying a four-step process: (1) we first determine whether the alleged error is in fact a constitutional issue; (2) next, we determine whether the error is manifest, that is, whether it had "practical and identifiable consequences"; (3) we then address the merits of the constitutional issue; and (4) finally, we pass upon whether the error was harmless. *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992).

■ *Constitutional Issue.* Is there a constitutional issue involving a manifest error? Generally, we review a trial court's decision to admit or exclude testimony for an abuse of discretion. *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001). The decision to admit or exclude opinion testimony generally involves the routine exercise of discretion by the trial court under applicable evidentiary rules. These rules govern evidentiary questions that do not necessarily implicate constitutional rights. *See State v. Trader*, 54 Wn. App. 479, 484, 774 P.2d 522 (1989); *State v. Wilber*, 55 Wn. App. 294, 299, 777 P.2d 36 (1989). On the other hand, no witness may express an opinion as to the guilt of a defendant. *Demery*, 144 Wn.2d at 759. Such an opinion violates the defendant's right to a trial by an impartial jury and his right to have the jury make an independent evaluation of the facts. *State v. Carlin*, 40 Wn. App. 698, 700-01, 700 P.2d 323 (1985), *overruled on other grounds by City of Seattle v. Heatley*, 70 Wn. App. 573, 577, 854 P.2d 658 (1993).

Because a constitutional issue is raised if the testimony here constitutes an impermissible opinion on Mr. Barr's guilt, the first part of the inquiry is satisfied.

■ *Manifest Error.* An error is "manifest" if it had "practical and identifiable consequences in the trial of the case." *Lynn*, 67 Wn. App. at 345. The officer's assessments concerning Mr. Barr's and A.J.'s credibility were a crucial part of the State's case—Officer Koss not only gave his opinion but bolstered that opinion with statements related to his Reid training. In the context of this case, the error here had "practical and identifiable consequences" at trial.

■ *Merits of the Constitutional Issue.* Was the testimony an impermissible opinion on Mr. Barr's guilt? To meet his burden, Mr. Barr must establish that Officer Koss's testimony constituted an impermissible opinion on Mr. Barr's guilt. The determination as to whether testimony is an impermissible opinion on guilt or a permissible opinion pertaining to an ultimate issue requires the consideration of: (1) the particular circumstances of the case, (2) the type of witnesses called, (3) the nature of the testimony and the charges, (4) defenses invoked, and (5) the other evidence presented to the trier of fact. *Heatley*, 70 Wn. App. at 579. Significantly, opinion testimony as to guilt does not necessarily implicate a constitutional right. *Id.* at 585-86.

In *Carlin*, a police officer's testimony that a police dog tracked the defendant by following a "fresh guilt scent" was held to be inadmissible opinion testimony implicating a constitutional right. *Carlin*, 40 Wn. App. at 703. The court concluded that "[p]articularly where such an opinion is expressed by a government official, such as a sheriff or a police officer, the opinion may influence the fact finder and thereby deny the defendant of a fair and impartial trial." *Id.*

In *Wilber*, the State presented two officers who testified that they had received special training to observe body and eye movements that enabled them to tell when a person was being truthful. *Wilber*, 55 Wn. App. at 298-99. The officers then gave opinions on whether a fact witness in the case was being truthful. The *Wilber* court, analyzing the

testimony as expert testimony under ER 702, found the officers' statements inadmissible because the officers' testimony did not satisfy generally accepted, scientific evidence standards. *Id.* at 299. Because the *Wilber* court resolved the issue by applying ER 702, the court did not apply the constitutional harmless error standard. Significantly, the *Wilber* court noted that the error would have been one of constitutional magnitude if the officers' testimony had been an impermissible opinion on the defendant's guilt. *Wilber*, 55 Wn. App. at 299 n.2.

■ The State maintains that the testimony here was not improper because the officer did not testify that Mr. Barr was being deceptive, but, rather, the officer's testimony consisted of observations of Mr. Barr's behavior indicating that there were signs that Mr. Barr was being deceptive. This is a distinction without a difference. The officer's testimony was clearly designed to give the officer's opinion as to whether Mr. Barr had committed the offense. For example, Officer Koss stated: "What I have been taught [by] some of these schools is people feel guilty and that they realize there is [sic] consequences and lots of times they'll verbalize those fears. So it was obvious to me he was afraid he was going to go to prison for this." RP (Dec. 11, 2002) at 81. Officer Koss also testified that: "At one point he made a statement about swearing on his daughter's life or something like that and I called him on it in the tape, if you remember, you know, that's one of the big flags like that and like the utterances about the thing going to prison, those are big flags when you see those things start to bunch together. You get an idea somebody is being deceptive." RP (Dec. 11, 2002) at 82. Clearly this testimony embodied an opinion by the officer that Mr. Barr had committed the offense and the officer had the training to determine that Mr. Barr's statements and body language were proof that this was true. In other words, the officer was testifying, as an expert, as to his opinion regarding manifestations of Mr. Barr's guilt.

Relying on *Heatley*, the State argues the officer's testimony was admissible because his observation and analysis

of Mr. Barr's behavior were helpful to the jury. The officer in *Heatley* was asked his opinion of the defendant's impairment due to alcohol consumption. The officer responded:

> "Based on my, his physical appearance and my observations of that and based on all the tests I gave him as a whole, I determined that Mr. Heatley was obviously intoxicated and affected by the alcoholic drink that he'd been, he could not drive a motor vehicle in a safe manner. At that time, I did place Mr. Heatley under arrest for [driving while intoxicated]."

*Heatley*, 70 Wn. App. at 576. Mr. Heatley argued that the officer's opinion encompassed the only disputed issue: whether he was guilty of driving while intoxicated. *Id.* at 577. In rejecting this argument, the appellate court acknowledged that the officer's testimony encompassed ultimate factual issues before the trier of fact; however, the court also concluded that the officer's testimony did not give a direct opinion on the defendant's guilt. *Id.* at 578. Further, the court held that the officer's opinion was admissible because it was based on the officer's experience and observations, and because the opinion was of assistance to the trier of fact. *Id.* at 579-80.

*Heatley* is distinguishable because the officer had experience in observing impairment based on alcohol and Washington permits lay witness testimony as to the degree of intoxication of another person if the witness has had the opportunity to observe that person. *Heatley*, 70 Wn. App. at 580. In contrast, Washington courts have not yet recognized as reliable any investigatory method based on the observation of a witness's body movements. *See Wilber*, 55 Wn. App. at 298-99. Here, as in *Wilber*, there is no evidence that the officer's opinion as to the significance of the witness's body movements was based on a theory generally accepted by the scientific community.

In short, the officer's testimony invaded the province of the jury by impermissibly commenting on Mr. Barr's guilt. *Harmless Beyond a Reasonable Doubt.* Was the error harmless beyond a reasonable doubt? The State

contends that the error in admitting the testimony was harmless because the jury was able to view the videotape and make its own determination as to whether Mr. Barr was telling the truth. We employ the "overwhelming un-tainted evidence" test to determine if the error was harm-less. *State v. Guloy*, 104 Wn.2d 412, 426, 705 P.2d 1182 (1985). Under the overwhelming evidence test, the court examines whether the untainted evidence is so overwhelm-ing that it leads necessarily to a finding of guilt. *Id.*; *Carlin*, 40 Wn. App. at 703.

In this case, the untainted evidence is not so overwhelm-ing as to necessarily lead to a finding of guilt. Here, Officer Koss testified that Mr. Barr was lying when he denied the allegations. At its heart, the ultimate issue here revolved around an assessment of the credibility of Mr. Barr and A.J. The court recognizes that the opinion of a government official, especially a police officer, may influence a jury. *See Carlin*, 40 Wn. App. at 703. Not only did Officer Koss indicate that he thought Mr. Barr was guilty, but the officer also testified that he had training in the area of discerning when people are lying. Thus, the officer's impressions of Mr. Barr's guilt were given added credibility by the officer's testimony about his training. While the untainted evidence established that A.J. lost control of her bowels and ran screaming down the street half naked—while Mr. Barr crawled under a car—this evidence is not so overwhelming that the admission of Officer Koss's testimony was harm-less beyond a reasonable doubt.

We conclude the admission of Officer Koss's testimony as to his training on the Reid Investigative Technique and Mr. Barr's guilt constituted a manifest constitutional error that was not harmless. Accordingly, we reverse Mr. Barr's con-victions and remand for a new trial.

SCHULTHEIS and BROWN, JJ., concur.

Review denied at 154 Wn.2d 1009 (2005).