# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>        Respondent,<br><br>   v.<br><br>ANDREW Z. SEVILLA, | No. 58814-5-II<br><br><br>UNPUBLISHED OPINION |

PRICE, J.  — Andrew Z. Sevilla appeals his convictions for first degree child molestation, first degree rape of a child, and second degree rape of a child.  For the first time on appeal, Sevilla claims that the trial court erred by admitting improper opinion testimony from two therapists.  We conclude that one of the therapist's statements was an improper opinion, but that its admission was not a manifest constitutional error.  Thus, we affirm.

## FACTS

In January 2019, Sevilla was suspected of sexually abusing his 13-year-old stepgranddaughter, K.  K.'s mother had found K. in possession of a phone that included numerous suspicious text messages from Sevilla, and she reported her concerns to police.  As part of the initial police investigation, K. was interviewed by a forensic interviewer, but she denied any sexual abuse by Sevilla.  After this interview, the police investigation ended.

However, in late 2019, K. disclosed to her therapist that from the ages of 4 or 5 to the ages of 11 or 12, Sevilla had sexually abused her.  Based on K.'s disclosures, the investigation resumed.

Several months later, in February 2020, Sevilla was charged with first degree child molestation, first degree rape of a child, and second degree rape of a child. The case proceeded to a jury trial in August 2023.

## I. MOTION IN LIMINE

Prior to the start of trial, the State moved for permission to introduce testimony from two of K.'s therapists, Christina Coffman and Amanda Stensgaard, under ER 803(a)(4), the medical hearsay exception. The State argued that K.'s statements to her therapists were admissible because they were made in the course of providing mental health treatment. Defense counsel objected; counsel argued that K.'s actual statements should not be admitted, but they agreed that the therapists could testify about "what was indicated to them . . . [in] the medical diagnosis." Verbatim Rep. of Proc. (VRP) at 218. The trial court granted the State's motion assuming that the proper foundation was laid that the statements were "part of medical diagnosis and treatment." VRP at 218.

## II. K.'S TESTIMONY

K. began her testimony by describing her childhood. She said that around the time she was five years old, she stopped living with her father and would visit him only on some weekends. At that time, K.'s father was living with his mother and his stepfather, Sevilla. When K. visited, she often stayed for the weekend. Sometimes during those visits, K.'s father was not there, so K. and her siblings just spent time with their grandmother and Sevilla.

K. described her relationship with Sevilla as something "[she] thought it was just a normal grandpa-granddaughter relationship." VRP at 760-61. However, as she got older, she noticed that Sevilla treated her differently than her brothers. Sevilla would always buy her "whatever [she]

wanted"—clothes, jewelry, food, a new iPhone—but Sevilla "told [her] not to tell [her] brothers because he didn't want them getting jealous and he would just always be getting [her] stuff and not them." VRP at 762.

K. also testified that during these weekend visits, starting from when she was about 4 or 5 years old until she was about 12, Sevilla would "always" come into her bedroom in the middle of the night, get in her bed behind her, and touch her vagina. VRP at 766. She said, "It happened every time at nighttime, so if we stayed two nights, it happened each night." VRP at 777.

K. recalled one night, when she was about 10 or 11, she had decided to sleep in her grandmother's bed, and Sevilla touched her vagina while her grandmother was sleeping:

> [My grandma] was laying in bed with us and he—at first it was just us. She was facing away from me, I was laying right next to her. He came—he came in the bedroom. I was laying down, facing my grandma and he puts his arm around me, he starts touching me like I said before, how he did in my bedroom.

VRP at 769. K. also described another instance, when she was about 5 or 6, where Sevilla touched her vagina while she was sitting on his lap and they were alone in her grandparents' living room.

K. testified that when this was happening she still thought of her relationship with Sevilla as a "normal grandfather-granddaughter relationship." VRP at 864. She testified that Sevilla would take her to go shopping or get food a few times a week, and Sevilla said that "he just wanted it to be [K.] and him." VRP at 791. K. testified that Sevilla would often send her text messages on the iPhone that he had purchased for her.[1] K. read to the jury some of the text messages from Sevilla, including the following:

---

[1] Photos of these text messages were later admitted into evidence.

[Sevilla:] Sorry last night fell asleep in the couch watching the Last Kingdom it—a romantic medieval warrior prince fall in love with a beautiful princess she's young and the prince is older but love only happens [it's the feelings] that count, how you feel towards that person it's like you and me love conquer all I'll call you or you call me what the plan I love you very much and miss you.

VRP at 806 (Ex. 4 at 71).

[Sevilla:] Did I say no to you? Everything you asked [let's be] the same feelings when we were very close to each other you got to show me that you also really care for me too not one way okay sweetheart just call me Andrew or Butch my nickname when we're just the two of us together okay love you.

VRP at 808 (Ex. 4 at 38).

[Sevilla:] Happy New Year 2019 new beginning for our relationship hoping to be more intimate I love you very much and miss you a lot.

VRP at 812 (Ex. 4 at 8). Sevilla included with the text messages numerous emojis depicting cartoon animals making romantic gestures.

K. recalled that because of multiple "stressors" in her life, she began to go to therapy with Christina Coffman. VRP at 780. K. explained that she did not tell anyone that Sevilla had touched her vagina until she told Coffman after seeing her for a few months (around December 2019). Up until this point, K. said she was not ready to tell anyone what Sevilla had done to her. But K. explained that working with Coffman made her more comfortable with talking about what had happened and how to cope with it.

K. also testified that she stopped seeing Coffman at some point but that she saw another therapist, Amanda Stensgaard, for about three or four months. K. said that she sought out therapy again because she had broken up with her ex-girlfriend, because she was having troubles with her father, and because of "what happened with [Sevilla]." VRP at 867.

4

III.  THERAPIST COFFMAN'S TESTIMONY

Christina Coffman, K.'s first therapist, also took the stand and testified generally about her professional knowledge of the impacts of trauma on children and specifically about her treatment of K.  Coffman discussed many topics, but her testimony can be roughly grouped into three categories: (1) Coffman's qualifications and initial diagnosis of K., (2) the impact of K.'s disclosure of the abuse on Coffman's assessment, and (3) Coffman's observations about the impact of K.'s trauma on her behavior and symptoms.

A.  COFFMAN'S QUALIFICATIONS AND INITIAL DIAGNOSIS OF K.

Coffman explained that in her position as a therapist, she "primarily work[s] with young children . . . up to about 15[,] . . . sexually abused victims[,] . . . [and] children who have had adverse childhood experiences . . . primarily neglect, abuse, [and] victimization."  VRP at 601. Coffman said that she "help[s] families navigate systems" and "support[s] children in processing their traumas."  VRP at 602.  She explained that "[w]e process thoughts, feelings, . . . we work on the symptoms that they're coming in for . . . related to their diagnosis."  VRP at 604.  She then creates a treatment plan that addresses the child's needs through therapeutic interventions and will refer the child for medication management services if needed.

Coffman testified that K. first came to see her in September 2019 "because there [were] concerns about some texts that mom became privy to and that [K.] had disclosed that she had been kissed by her stepgrandfather[, Sevilla]."  VRP at 607.

Initially, their sessions focused on K.'s anxiety and distress over these "inappropriate" text messages that K. had received from Sevilla.  VRP at 618.  K. exhibited varying symptoms such as

anxiety, depression, emotionality, sleeplessness, and disengagement from school and activities that she had previously enjoyed.

However, K. had "multiple sources of stressors" that were related to her "family system." VRP at 637. Coffman explained, "I think that when her parents were together [there] was . . . domestic violence and there was drug use by—on her father's side . . . and a contentious relationship and so she did spend more time with her grandparents . . . and she had developed anxiety." VRP at 637. K. also had just broken up with her girlfriend who her brother was now dating. Additionally, K.'s mother had a boyfriend who "was not a healthy guy." VRP at 633. Coffman described K. as "emotionally fragile" and said that "[K.] had bouts of anger and frustration[,] but there was not at that time a name for it of where it was all coming from." VRP at 637.

During these initial sessions (and prior to K.'s disclosure), Coffman could not "pinpoint" the main cause of K.'s symptoms; however, she had a "suspicion" that in addition to K.'s family stressors, "more . . . had gone on" between K. and Sevilla than just text messages and a kiss. VRP at 638. When Coffman began to suggest that K.'s mother may have had similar suspicions, the trial court immediately interrupted her testimony:

> [Coffman:] And so—and mom, I think her instincts also were the same, and I can't speak for her, but I think I was having those clinical suspicions as well . . . .
>
> Court: Sorry. It's not permitted to have the witness speculate what their suspicions are.

VRP at 638.

6

Because "[K.] wasn't at the time able to name what was happening to her" and Coffman wasn't able to "diagnose [K.] with a specified trauma," K. "was diagnosed with unspecified trauma and stressor related disorder." VRP at 607.

B. K.'s DISCLOSURE OF ABUSE AND ITS IMPACT ON COFFMAN'S ASSESSMENT

Coffman then testified about the first time K. disclosed the abuse. Coffman recounted that on December 12, 2019, about two months after K. began therapy with Coffman, K. first told her that Sevilla had touched her vagina when she used to stay over at her grandparents' house.

> [K.] disclosed to me that . . . her stepgrandfather—while she was staying with her grandmother . . . he'd go into her bedroom at night and cuddle her. That cuddling turned into fondling and that fondling turned into . . . putting his hands on her vagina and in her vagina.

VRP at 608-09. As K. described the abuse during this first disclosure, Coffman described her as "very emotional" and "very distraught." VRP at 609.

After this disclosure, Coffman testified she could finally "pinpoint" the cause of K.'s distress. VRP at 638-39.

> [State:] Then as time went on and more sessions and more information was revealed to you by [K.], . . . were you able to, I guess, complete a more finite or . . . discreet . . . pinpoint of the cause of her distress?
>
> [Coffman:] [N]ot until the day of the disclosure. I think her fragility set her up for that emotional response to her girlfriend leaving and who started dating her brother. [T]hat was a source of emotional pain but she did not have the coping skills because she was so fragile . . . to maneuver through that.
>
> [B]ut it wasn't until the disclosure that everything kind of clicked, then that's when all the pieces of the puzzle kind of came together.

VRP at 638-39.

Coffman went on to testify that K.'s disclosure "provid[ed] [her] with the piece of information that [she] needed in order to . . . have a full picture" of K.'s "sources of pain, anxiety[,] and stresses." VRP at 640.

C. COFFMAN'S OBSERVATIONS ABOUT THE IMPACT OF K.'S TRAUMA ON HER BEHAVIOR AND SYMPTOMS

Coffman also testified about her impressions of how K.'s trauma affected K. mentally and physically. She explained that K.'s "fragil[ity]" and general "family system struggles" caused delays in K.'s disclosure of the abuse. VRP at 637. She said, "I think those early adverse experiences set her up to be more vulnerable and not reporting the abuse earlier." VRP at 637.

In response to questioning from defense counsel, Coffman offered that K.'s trauma could also have been a possible reason why other clinicians, specifically a nurse practitioner named Burgess, had described K. as "not a reliable historian." VRP at 644.

[Defense Counsel:] So the nurse practitioner, [Burgess], is at Columbia River—

[Coffman:] I do read her records. She's no longer with our agency. But yes, I do read her medication management notes.

[Defense Counsel:] And so in terms of her notes about her clinical assessment where she indicates that [K.] is not a reliable historian and contradicts herself, you don't think that that's important for you to know?

[Coffman:] No, I think that that's a symptom of trauma.

VRP at 644.[2]

---

[2] Coffman also testified that she also did not consider the nurse practitioner's impressions relevant to her sessions with K. because they pertained to only the nurse practitioner's perceptions during that particular appointment. Coffman did not consider them "direct advice" on how Coffman should do her therapeutic job.

Coffman testified about how K.'s disclosure of the abuse resulted in "some physical reaction to stress," including having a rash. VRP at 610.

> [S]he reported this herself, that it felt like a relief she was finally free of holding this terrible secret. [S]he went through a period of time where she was calmer, . . . but then her body had this huge reaction and she had an incredible severe rash all over her body.
>
> [A]nd her lymphatic system was just out of whack . . . and I can't—I'm not a medical doctor, . . . but the recommendation was to go to her primary care physician . . . and address those kind of symptoms. She was not only having emotional symptoms she was having physical symptoms, . . . which is no[t] uncommon for young adults, children to experience a reemergence of symptoms even heightened after a disclosure is made.

VRP at 640.

When defense counsel suggested that K.'s rash and stress could have been caused by pressure from K.'s mother to make accusations against Sevilla, Coffman responded that she did not think that was the case:

> [Defense Counsel:] And isn't it true that she could have this breakout of rash, this physical response to the pressures put onto her to make up additional events by her mother or some other source?
>
> [Coffman:] No.

VRP at 646. However, Coffman later clarified that she could only say that K. "was having a bodily reaction to stress." VRP at 646. She could not say "what that stress actually came from," just that "there were stressors." VRP at 647.

After the disclosure, Coffman also testified that in addition to this rash, K. reported having flashbacks and feeling "terrible guilt" about her disclosure. VRP at 610. Towards the end of her counseling appointments with K., Coffman said that K. was "closed off," "still not sleeping at

night, sleeping during the day," and that K. was seeing health specialists for her medical conditions. VRP at 613.

IV. THERAPIST STENSGAARD'S TESTIMONY

K.'s second therapist, Amanda Stensgaard, also testified. She explained that she provided therapy to K. from August 2022 through January 2023. Stensgaard was a "qualified mental health professional," but also had an additional certification for working with patients who experienced trauma.

Stensgaard testified that K. restarted therapy because of "anxiety and trauma from [her] past" and because "she was upset about the breakup with her girlfriend." VRP at 699. Stensgaard also said that K. "definitely fulfilled the symptoms for post[-]traumatic stress disorder" (PTSD) and later received that diagnosis.[3] VRP at 681.

Stensgaard said that she did not review the notes of other medical or mental health providers that K. was seeing at the time because she "[does]n't want to come into an assessment or a first session with somebody with any pre or false or anything in [her] head other than the person [she's] meeting there in front of [her]." VRP at 698. Stensgaard said,

> I come to session and what the client tells me the client tells me. And when I have meetings with my supervisor who is aware of more than I, those are things discussed.

VRP at 701-02. Thus, while K. was seeing her, Stensgaard said that she knew only what K. reported to her. So, when it came to K.'s physical health, Stensgaard's knowledge was limited to

---

[3] Although defense counsel did not object to Stensgaard's initial description of why K. sought therapy, defense counsel objected to Stensgaard's testimony about her diagnosis of PTSD for lack of foundation. The objection was overruled.

things they discussed in therapy and what Stensgaard knew generally about "the [physical] [e]ffects of trauma" and how trauma could potentially contribute to self-harming behaviors. VRP at 701.

Although Stensgaard was aware of K.'s experience with sexual abuse, she was "very, very careful not to re-traumatize" K., and she did not want to pressure K. to discuss it. VRP at 691. Instead, Stensgaard said her sessions with K. "always focused around healing and basically getting her life back and herself and her identity back from that trauma she had . . . experienced when she was younger." VRP at 682.

Stensgaard explained that K.'s "high anxiety would really rev up around times—seemed a court date was reset several times and each time that would happen her anxiety would really . . . increase." VRP at 690. During these times, "when court was about to come up," Stensgaard said that K. would also engage in self-harm. VRP at 692.

The State asked Stensgaard if, through her treatment of K., she was able to "pinpoint" the source of K.'s anxiety and distress:

> [The State:] So, uh, during that time that you were treating [K.], uh, were you able to . . . I guess able to pinpoint the source of her trauma and stress?
>
> [Stensgaard:] It was always pinpointed from—it was based on one—one thing really, the trauma from abuse from sexual abuse from her past.

VRP at 691.

Stensgaard testified that she eventually stopped seeing K. for therapy because of K.'s anxiety surrounding Sevilla's court dates. Stensgaard said that "each time court was coming up," K. "would get a little inconsistent." VRP at 693. And, when Stensgaard had a conversation with K. about this, Stensgaard noticed that K.'s anxiety was "through the roof." VRP at 693.

11

Defense counsel never objected at any point to either Stensgaard's or Coffman's testimony on the basis of improper opinion testimony.

V. GWEN SEVILLA'S TESTIMONY

The defense called Gwen Sevilla, Sevilla's wife and K.'s grandmother, to the stand.[4] Gwen's testimony presented a different picture of K.'s relationship with Sevilla.

Gwen testified that K. and her siblings often came over only during the day, and when they did spend the night it was always when their father was also at the house. Gwen testified that K. never slept in Gwen and Sevilla's bed after she was about five or six years old. After that point, K. only slept on the floor with her brother or one of her cousins or she slept in her own room with the door locked. Gwen had the only key to get into K.'s room, which Gwen kept on a keychain in her purse. Gwen testified that because Sevilla did not have a key, there was no way for him to get into K.'s room without Gwen's knowledge. Gwen also testified she was a "light sleeper" and she would hear if Sevilla ever got up in the middle of the night to move around. VRP at 955.

Gwen never observed "anything unusual" between Sevilla and her grandchildren. And while she acknowledged that Sevilla favored K., she never observed K. feeling uncomfortable or avoidant of Sevilla. Referencing one of the text messages, Gwen acknowledged that it was not "normal" "for a sixty-some-odd[-]year[-]old grandfather . . . to have a sort of relationship with a young granddaughter in—in a relationship where it's a warrior prince and a young princess in love together," but Gwen claimed that saying that was just Sevilla's "way of interpreting his emotions and feelings." VRP 968-69.

---

[4] To avoid confusion, we refer to Gwen by her first name.

ANALYSIS

Sevilla lists numerous excerpts of testimony from Coffman and Stensgaard and argues that they constituted improper opinion testimony as to his guilt and violated his constitutional right to a fair trial. In assessing all of the testimony that Sevilla alleges was improperly admitted, we agree that one of Stensgaard's statements constituted an improper opinion on Sevilla's guilt; however, Sevilla did not object to this testimony at trial and this testimony was not manifest constitutional error. Thus, we affirm the trial court.

I. LEGAL PRINCIPLES

A. IMPROPER OPINION TESTIMONY

Expert witnesses can use their qualifications and experience to help the jury "understand the evidence or to determine a fact in issue" so long as that testimony is generally accepted by the scientific community.[5] ER 702; *State v. Dunn*, 125 Wn. App. 582, 589, 105 P.3d 1022 (2005). However, witnesses cannot generally tell the jury their "personal belief, as to the guilt of the defendant, the intent of the accused, or the veracity of witnesses." *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). Improper opinions of a defendant's guilt violate the right to a fair trial and the right to have an impartial jury "make an independent evaluation of the facts." *State v. Bar*, 123 Wn. App. 373, 380, 98 P.3d 518 (2004), *review denied*, 154 Wn.2d 1009 (2005). However, "if the testimony does not directly comment on the defendant's guilt or veracity,

---

[5] A witness may qualify as an expert by explaining their relevant education and practical experience on a particular matter. *State v. Jones*, 71 Wn. App. 798, 814, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994).

helps the jury, and is based on inferences from the evidence, it is not improper opinion testimony." *State v. Johnson*, 152 Wn. App. 924, 930-31, 219 P.3d 958 (2009).

At trial, Sevilla did not object to either Coffman's or Stensgaard's statements on the basis of an improper opinion of guilt; thus, we engage in a multistep process to determine whether admission of Coffman's or Stensgaard's testimony was reversible error. *See State v. Jones*, 71 Wn. App. 798, 809-10, 863 P.2d 85 (1993), *review denied*, 124 Wn.2d 1018 (1994).

When the alleged statement is not objected to at trial, as here, the admission of such testimony is not automatically reviewable; it must be a manifest constitutional error. *Barr*, 123 Wn. App. at 380. The reviewing court must still determine whether the error had " 'practical and identifiable consequences in the trial of the case' " to determine whether it is manifest. *Id.* at 381 (quoting *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)). "Manifest error" requires either "a nearly explicit statement by the witness that the witness believed the accusing victim" or "an explicit or almost explicit witness statement on an ultimate issue of fact" (such as the defendant's guilt). *State v. Kirkman*, 159 Wn.2d 918, 936, 155 P.3d 125 (2007). Inferential or indirect opinions of credibility or guilt are not enough. *Id.* at 930, 936 (holding that detective's testimony that the victim "was able to distinguish between truth and a lie and . . . expressly promised to tell him the truth" before relaying detailed descriptions of sexual abuse was not a "direct opinion" on the victim's credibility and thus was not manifest error); *see*, *e.g.*, *State v. Chuprinov*, No. 85145-4-I, slip-op. at 25 (Wash. Ct. App. Oct. 7, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/851454.pdf (holding that while police officer's statements describing the victim as "open," "honest," and "frank" were improper because they "inevitably invoke[d] credibility," they were *implied* opinions that the victim was credible only

and thus were not *explicit* statements that rose to the level of a manifest constitutional error). This requirement "is consistent with our precedent holding the manifest error exception is narrow." *Kirkman*, 159 Wn.2d at 936.

Manifest constitutional error can be harmless, but "only if the untainted evidence is so overwhelming that it necessarily supports a guilty verdict." *State v. Florczak*, 76 Wn. App. 55, 75, 882 P.2d 199 (1994), *review denied*, 126 Wn.2d 1010 (1995). Under this standard, prejudice is presumed and the State must show beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error. *State v. Quaale*, 182 Wn.2d 191, 202, 340 P.3d 213 (2014).

Thus, as we analyze those statements identified by Sevilla, we must first determine whether admission of this testimony was an improper opinion on the defendant's guilt. *Jones*, 71 Wn. App. at 809-10. If the testimony included an improper opinion, then we must then determine whether the error was manifest. *Id.* Then, if the error was manifest, we determine whether it was harmless under a manifest error harmlessness analysis. *Id.* at 810. If the testimony fails at any one of these steps, then no further analysis is needed—admission of the testimony is not reversible error. *See id.* at 809-10.

B. TESTIMONY FROM THERAPISTS AND MENTAL HEALTH PROFESSIONALS

In child sex abuse cases, testimony from mental health professionals is not uncommon and has been found to be useful to the jury. For example, a therapist can testify that it is an accepted phenomenon that child victims will sometimes recant their accusations. *State v. Madison*, 53 Wn. App. 754, 764-65, 770 P.2d 662, *review denied*, 113 Wn.2d 1002 (1989). As explained in *Madison*, "[s]uch evidence is offered not to establish that the crime was committed, but rather to

explain that failure to leave or the failure to report does not necessarily demonstrate that the crime did not occur." *Id.* at 765. Therapists have also testified that certain behaviors and symptoms are consistent with childhood trauma or a diagnosis of PTSD. *Florczak*, 76 Wn. App. at 73-74. Such testimony is admissible because it still requires jurors to evaluate the evidence and come to their own conclusion about the actual source of the child's trauma (and whether that source was the alleged sexual abuse). *Id.* at 73 n.11.

However, like all witnesses, there are limits—therapists may still not give an opinion on a defendant's guilt or about whether they believe the accuser is being truthful. *Montgomery*, 163 Wn.2d at 591. Thus, while a therapist may testify that a victim exhibits PTSD symptoms, they cannot tie those symptoms to the alleged crimes. *Florczak*, 76 Wn. App. at 74. For example, in *Florczak*, Division I held that while a social worker's testimony about the child's PTSD diagnosis was permissible, testimony that the victim's PTSD "was secondary to sexual abuse" went too far and invaded the province of the jury. *Id.*[6]

Our Supreme Court addressed a similar issue in *State v. Black*. There, the court held that an expert witness could not diagnose the victim with "rape trauma syndrome" or " 'post-traumatic stress disorder' with rape as the likely stressor." 109 Wn.2d 336, 349, 745 P.2d 12 (1987). The opinion explains,

> We do not imply, of course, that evidence of emotional or psychological trauma suffered by a complainant after an alleged rape is inadmissible in a rape prosecution. The State is free to offer lay testimony on these matters, and the jury is free to evaluate it as it would any other evidence. We simply hold that the State

---

[6] Division I concluded that the error was a manifest constitutional error without conducting an analysis; they merely concluded that there were " 'practical and identifiable consequences in the trial of the case.' " *Florczak*, 76 Wn. App. at 74 (quoting *Lynn*, 67 Wn. App. at 345).

may not introduce expert testimony which purports to scientifically prove that an alleged rape victim is suffering from rape trauma syndrome.

*Id.*[7] Accordingly, testimony from therapists generally must strike a balance—it is permissible to educate jurors about psychological symptoms and phenomena that could be useful in their decision, but therapists cannot "diagnose" or opine that the presence of those symptoms are connected directly to the consequences of the alleged crime. Such testimony would usurp the jury's role.

## II. APPLICATION – COFFMAN'S TESTIMONY

Sevilla argues that there were multiple instances where Coffman's testimony constituted "her explicit opinion that [K.] had been sexually abused." Appellant's Opening Br. at 44. He contends that throughout Coffman's testimony, she gave explicit opinions "that [K.]'s allegations were true" and "that certain symptoms [K.] had were caused by [Sevilla's sexual] abuse and *could not have been caused by anything else*." Appellant's Opening Br. at 44. Although Sevilla discusses Coffman's statements collectively with a general overarching argument that they constitute improper opinion testimony, we analyze Sevilla's complaints about Coffman's testimony by using the same categories used above: (1) Coffman's qualifications and initial diagnosis of K., (2) the impact of K.'s disclosure of the abuse on Coffman's assessment, and (3) Coffman's observations about the impact of K.'s trauma on her behavior and symptoms.

---

[7] In *Black*, defense counsel had objected to the comments at trial so manifest constitutional error was not addressed. 109 Wn.2d at 339.

A. COFFMAN'S QUALIFICATIONS AND INITIAL DIAGNOSIS OF K.

First, Sevilla points to portions of Coffman's testimony where she explained her qualifications and her initial diagnosis of K. Coffman explained that she works with " 'sexually abused victims' " and children with " 'adverse childhood experiences' " and explained that K. was diagnosed with " ' [t]rauma and stressor related disorder.' " Appellant's Opening Br. at 40 (emphasis omitted) (alteration in original) (quoting VRP at 601, 607). Sevilla cites to these statements, but he does not make a direct argument about why this testimony was improper; rather, he appears to suggest that the actual words used by Coffman to describe her expertise somehow show that Coffman had decided that K. had, in fact, been sexually abused by Sevilla.

We disagree that these statements rise to the level of improper opinion testimony. Expert witnesses are required to explain their qualifications in order to testify about matters within their field. *Jones*, 71 Wn. App. at 814. Therapist witnesses can also use their personal observations and determine whether those behaviors fit into a particular category or diagnosis, so long as that diagnosis is well-accepted within the scientific community. *Florczak*, 76 Wn. App. at 74. We see nothing in Coffman's description of her qualifications that invaded the province of the jury. No further inquiry is needed regarding manifest constitutional error or harmless error.

B. IMPACT OF K.'S DISCLOSURE OF ABUSE ON COFFMAN'S ASSESSMENT

Second, Sevilla highlights portions of Coffman's testimony where she discussed the impact of K.'s initial December disclosure of abuse on Coffman's treatment of K.

Coffman testified that K.'s "disclosure" (that Sevilla sexually abused her) gave Coffman " 'a full picture of . . . her sources of pain, anxiety and stresses.' " Appellant's Opening Br. at 42 (emphasis omitted) (alteration in original) (quoting VRP at 640). And that it wasn't until K.'s

disclosure that " 'everything kind of clicked' " for Coffman to " 'pinpoint the cause of [K.]'s distress.' " Appellant's Opening Br. at 41 (emphasis omitted) (quoting VRP at 639). Sevilla appears to contend that this testimony constituted an opinion from Coffman that the cause of K.'s trauma *was* sexual abuse by Sevilla.

Here, too, these statements do not rise to the level of improper opinion testimony. Coffman's statements stopped short of opining as to whether K.'s allegations were true. Rather, Coffman was explaining how the act of K. talking about her allegations impacted their therapy sessions. She specifically linked K.'s "disclosure" to K's symptoms in her efforts to make sense of K.'s trauma—Coffman did not overtly link K.'s disclosure to the *fact* of abuse.

Sevilla also points to Coffman's testimony that even before K. told her that Sevilla had sexually abused her, Coffman had " 'suspicions' " that Sevilla had done more than send K. text messages or kiss her. Appellant's Opening Br. at 41 (quoting VRP at 638). Additionally, Coffman testified that she thought K.'s mother shared her same " 'instincts' " (although she was cut off by the trial court before she could further explain). Appellant's Opening Br. at 41 (quoting VRP at 638). Sevilla appears to contend that these statements constituted a personal opinion that Coffman personally believed that K. was truthful.

Even if Coffman's testimony about her suspicions could be considered generally improper, because Sevilla failed to object, the testimony must rise to the level of being "an explicit or near explicit" opinion on Sevilla's guilt as required to be considered manifest error. But "suspicions" clearly fall short of being such an explicit or near explicit opinion. Thus, no further inquiry is needed and admission of this testimony was not reversible error.

### C. Impact of K.'s Trauma on K.'s Behavior and Symptoms

Third, Sevilla points to portions of Coffman's testimony where she discussed the impacts of K.'s trauma on K.'s behavior. This category of testimony is found in several different areas. For example, Sevilla identifies testimony during which Coffman "dismissed" testimony from another medical provider (nurse practitioner Burgess) who had the impression that K. was not a reliable source of information, which Coffman claimed was Burgess observing " 'a symptom of trauma.' " Appellant's Br. at 43 (emphasis omitted) (quoting VRP at 644). Sevilla also points to Coffman's statements that K.'s " 'early adverse experiences set her up to be more vulnerable and not reporting the abuse earlier.' " Appellant's Opening Br. at 43 (emphasis omitted) (quoting VRP at 637).

Sevilla also identifies Coffman's answer of "No" to defense counsel's question about whether she thought that K.'s physical manifestations of stress could have been "due to physical response to the pressures put onto her to make up additional events by her mother or some other source." VRP at 646.

We disagree that these statements were improper opinions on Sevilla's guilt. As for testimony about nurse practitioner Burgess calling K. an unreliable "historian," Coffman never directly said that K. was telling the truth during her therapy sessions—she simply acknowledged that a child lying could be part of a symptom of trauma. Also, when Coffman said that children with "adverse experiences" sometimes delay in reporting, she did not say that because K. delayed in reporting, K. was definitely telling the truth. Rather, her testimony was a mere "explain[ation] that . . . failure to report does not necessarily demonstrate that the crime did not occur." *Madison*,

53 Wn. App. at 765. These observations were simply not tied directly enough to K. and Sevilla to constitute an improper opinion.

With regard to her answer of "No" to defense counsel, although Coffman initially admitted that she did not think that K.'s physical stress symptoms could have come from pressure from her mother, she clarified almost immediately that she did not know the actual cause of K.'s physical symptoms, only that K.'s physical symptoms were caused by "stressors." VRP at 647. Especially given Coffman's clarification, this testimony did not invade the province of the jury or opine that any sexual abuse occurred.[8]

Thus, admission of this category of Coffman's testimony was not improper. And, even if some of the statements rose to the level of being improper, none of them were a "near explicit" opinion of guilt that would constitute a manifest error.

III.. APPLICATION –STENSGAARD'S TESTIMONY

Sevilla similarly argues that Stensgaard's testimony "gave improper explicit or near-explicit testimony on Mr. Sevilla's guilt, [K.]'s veracity and credibility, and the veracity and credibility of [K.]'s accusations." Appellant's Opening Br. at 48.

For example, Sevilla appears to assert that when Stensgaard testified that she diagnosed K. with PTSD, Stensgaard was essentially testifying that K. had been sexually abused. Sevilla also identifies Stensgaard's testimony where she discussed how whenever a court date would come up

---

[8] Notably, Coffman's answer of "No" came in response to a question from defense counsel, opening the door to the testimony and arguably making any error an invited one. *See State v. Korum*, 157 Wn.2d 614, 646, 141 P.3d 13 (2006) ("Under the invited error doctrine, a party may not set up error at trial and then complain about the error on appeal.").

that K.'s anxiety would increase, apparently implying that when Stensgaard associated court with anxiety, she was endorsing the truthfulness of the allegations.

We are unpersuaded that admission of these statements constituted an improper opinion on guilt. As Sevilla even indicates in his brief, therapists can testify to their own observations and give a diagnosis of PTSD, so long as they do not connect the diagnosis to a particular cause, which Stensgaard did not do. *See Florczak*, 76 Wn. App. at 73-74; *see also Black*, 109 Wn.2d at 349. And Stensgaard's observations about K.'s anxiety surrounding Sevilla's court dates are just that, observations. At no point did Stensgaard give an opinion why she thought K. had anxiety about these court dates. Perhaps it was because K. was anxious because she was lying about some aspect of her story, perhaps it was because court is inherently stressful, or perhaps it was because the allegations about Sevilla's abuse were true. The jury still retained the ability to evaluate this testimony and make its own determination. *See Florczak*, 76 Wn. App. at 73-74.

Sevilla also identifies the following interaction between Stensgaard and the State about the source of K.'s trauma:

> [The State:] So, . . . during that time that you were treating [K.], . . . were you able to . . . I guess able to pinpoint the source of her trauma and stress?
>
> [Stensgaard:] It was always pinpointed from—it was based on one—one thing really, the trauma from abuse from sexual abuse from her past.

VRP at 691. Sevilla contends that this testimony was an improper opinion that K.'s trauma resulted from Sevilla's sexual abuse.

Unlike the other statements identified by Sevilla, we agree that this testimony constituted an improper opinion on Sevilla's guilt. This testimony was not merely describing K.'s diagnosis or Stensgaard's observations, it connected them to sexual abuse. *Florczak*, 76 Wn. App. at 74.

And it used Stensgaard's expertise to imply that this could be scientifically proved. *See Black*, 109 Wn.2d at 349.

However, although Stensgaard's statement was improper, it does not rise to the level of being manifest constitutional error. Stensgaard did not specifically identify the source of the "sexual abuse from [K.'s] past." Thus, it was an inferential opinion, not an "explicit or near explicit" opinion on Sevilla's guilt that would be required for reversal of Sevilla's convictions. *See Kirkman*, 159 Wn.2d at 930, 936; *see also Chuprinov*, No. 85145-4-I, slip op. at 25.

III. STATEMENT OF ADDITIONAL GROUNDS

Sevilla enumerates 14 "claims" in his statement of additional grounds (SAG), stating generally that they show he was deprived the right to a fair trial and his Fifth and Sixth Amendment rights. However, within these 14 items, there appears to be seven actual claims.[9]

First Sevilla claims that it was error that there was no DNA evidence taken of himself nor K. Although SAG claims do not require reference to the record or citation to authorities, they must still inform us of the nature and occurrence of the alleged errors. RAP 10.10(c). Moreover, we do not consider matters outside the record on a direct appeal. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). Thus, because Sevilla does not explain the relevance or import of there being allegedly no DNA evidence and because this claim relies, at least in part, on materials outside the record, we do not review it.

---

[9] Three of Sevilla's claims (SAGs 9, 10, and 11) are citations to cases. Four other claims appear to be either combined or repeated versions of other claims (SAGs 3, 5, 6, 8). The final "claim," SAG 14, appears to be Sevilla's hopes that his appellate attorney is able to "do her best," which does not require our review.

Second, Sevilla claims that it was error that the law enforcement investigating this case did not take a report from him personally but that they relied on reports from Child Protective Services. Again, Sevilla fails to inform us of the nature of the error and our record does not include information about what was not done throughout the course of this investigation. Thus, we cannot review it. *Alvarado*, 164 Wn.2d at 569.

Third Sevilla claims that the text messages with K. were fabricated and that he no longer has access to his phone or K.'s phone. Any information about whether these text messages were fabricated (the record shows the text messages were authenticated and admitted by the trial court) is outside our record. Thus, we cannot review this claim. *Id.*

Fourth, Sevilla claims that his convictions and sentence violate double jeopardy because he was charged with this same crime in January 1999 and his charges were dismissed. Our record includes no information about any other charged, but dismissed, cases. Thus, we cannot review this claim. *Id.*

Fifth, Sevilla claims that it was error that he was deprived of the right to a fair trial because all of the jurors in his case were white and that his conviction was the result of racial bias and discrimination. *See* SAG 7.[10] Our record includes no racial or other demographic information about the jurors. Thus, we cannot review this claim. *Id.*

Sixth, Sevilla claims that his convictions are an injustice because he was not asked to pick jurors, because the investigator assigned to his case did not appear at trial, and because none of his witnesses were ever called at trial. However, our record includes no information about the jury

---

[10] SAG 7 appears to combine several different claims.

No. 58814-5-II

selection process, Sevilla's investigator, or potential witnesses. Moreover, Sevilla fails to inform us of the nature of any error here. RAP 10.10(c). Thus, we cannot review this claim. *Alvarado*, 164 Wn.2d at 569.

Seventh, Sevilla claims that his "lawyer . . . was not on my sentencing . . . only [their] reliever attorney . . . ." SAG 13. Our record shows that Sevilla was represented by two attorneys, and each appeared at separate times on Sevilla's behalf. One of those two attorneys appeared at Sevilla's sentencing. Because of this, Sevilla fails to inform us of the nature of the error. RAP 10.10(c).

## CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

GLASGOW, J.

25