# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60152-4-II |
| Respondent, | |
| v. | |
| WALTER RAY POOLE, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Following a jury trial, Walter R. Poole appeals his conviction for second degree assault against Billie Jo Vargas. Poole raises several challenges on appeal, including improper witness opinion testimony, prosecutorial misconduct, ineffective assistance of counsel, and cumulative error.

Regarding improper witness opinion testimony, because Poole raises the issue for the first time on appeal and fails to demonstrate a manifest error affecting a constitutional right, Poole has failed to preserve this issue for appeal, and we decline to review this issue. With regard to the prosecutorial misconduct claim, because the State did not improperly bolster its witness's credibility, there was no prosecutorial misconduct. With regard to the ineffective assistance of counsel claim, because defense counsel did not perform deficiently by not objecting to certain witness testimony and because Poole fails to establish prejudice, Poole's claim of ineffective assistance fails. Finally, because no combination of errors deprived Poole of a fair trial, the cumulative error doctrine does not apply. Accordingly, we affirm.

FACTS

A.   BACKGROUND

In the early morning hours of January 27, 2024, law enforcement responded to a 911 call from Vargas, claiming that her husband, Poole, had strangled her.

When officers arrived at Vargas and Poole's residence, they found Vargas sitting inside an idling truck in the driveway. Vargas was sitting in the driver's seat, "crying and . . . frantic." Verbatim Rep. of Proc. (VRP) (Sep. 11, 2024) at 263. Deputy Joel Nault spoke with Vargas. Deputy Nault immediately observed that Vargas had "redness around her neck and left ear and a scabbing cut to her jaw line." VRP (Sep. 11, 2024) at 266. Vargas stated that Poole had "'choked'" her. VRP (Sep. 11, 2024) at 265.

Shortly after the officers arrived, Poole stepped outside of the house. Deputy Nault instructed Poole to speak with another officer while Deputy Nault and Vargas went inside the house.

Vargas told Deputy Nault that she and Poole had gone to bed earlier that evening; however, she woke up around 11 p.m. to find Poole gone. Vargas called Poole several times and sent him text messages, but Poole did not immediately answer. Poole eventually answered one of Vargas' calls, and Poole returned home.

When Poole came home, Vargas was in bed. According to Vargas, she woke up to Poole on top of her and squeezing her neck. Vargas attempted to fight Poole off of her, but lost consciousness.

The next thing Vargas recalled was seeing Poole standing a few feet away from her. Vargas grabbed her phone with the intention of calling the police. Poole snatched Vargas' phone from

her hand, and the two proceeded to fight over her phone. Ultimately, Vargas obtained her phone, fled the house, and got into her truck, where she called the police. Poole followed Vargas outside, and according to Vargas, grabbed a furniture dolly and swung it at the truck "like he was going to break [the] windows." VRP (Sep. 11, 2024) at 224. Law enforcement arrived shortly thereafter.

Sergeant Howard Reynolds spoke with Poole regarding the incident. Sergeant Reynolds could smell alcohol on Poole from three to eight feet away. Additionally, Sergeant Reynolds observed an injury on Poole's ring finger.

Poole informed Sergeant Reynolds that he had wanted to be intimate with Vargas that evening, but she rejected him. Poole then left to go to the casino.

When Poole arrived at the casino, he saw Vargas calling his phone. He initially did not pick up, but he answered after a third call. Vargas wanted him to return home. Poole went home.

According to Poole, Vargas was awake when Poole returned home. Vargas was upset and questioned where Poole had been. Poole and Vargas argued for a few minutes, then Poole proceeded to go to bed. Poole laid down in bed while Vargas sat on the other side of the bed. Vargas began elbowing him. Poole grabbed Vargas' arms to prevent her from elbowing him and held her in a "cross-collar choke," a technique taught in "Army Combative," a component of basic combat training in the army. Clerk's Papers (CP) at 2.

Vargas fled the house. Poole followed Vargas. According to Poole, Vargas grabbed a furniture dolly and put it in Poole's path to obstruct him. Vargas then got into her truck. Poole picked up the furniture dolly and "was going to throw it on the back of the truck to get it out of the way." VRP (Sep. 12, 2024) at 352. However, Poole has a "bad back" and he instead "put it where it was supposed to be" under a carport. VRP (Sep. 12, 2024) at 353. Poole was unaware if the

3

furniture dolly hit the truck at any time. Poole then went inside the house, but he stepped outside once the officers arrived.

B.      TRIAL

The State charged Poole with one count of second degree assault, with a domestic violence (DV) allegation, and one count of interfering with reporting domestic violence, also with a DV allegation. The parties proceeded to a jury trial.

1.      Witness Testimony

Poole, Vargas, Deputy Nault, and Sergeant Reynolds testified at trial.

a.      Vargas testimony

Vargas was the first witness in the State's case-in-chief. Vargas testified to her version of the facts described above. However, at the time of trial, Vargas testified that when she was calling and texting Poole, Poole never responded to her, and they never spoke on the phone. Additionally, Vargas stated that she never elbowed Poole or struck him with her phone.

Vargas also testified that on the night of the incident, she spoke with officers within 30 minutes of the incident. During direct examination, the State inquired about the statement Vargas gave the officers:

[STATE:] Do you recall how you were feeling at the time you gave the statement to law enforcement?

[VARGAS:] Yeah, scared. I was in pain. My throat was hurting.

[STATE:] Were you honest with the police?

[VARGAS:] Yes, ma'am.

VRP (Sep. 11, 2024) at 237.  The State then asked Vargas about a second statement Vargas gave during an interview with defense counsel before trial:

> [STATE:]  And then do you recall several months later giving another statement about what happened to [defense counsel] and her staff?
>
> [VARGAS:] Yes, ma'am.  I remember meeting with her.
>
> [STATE:] And when did that occur, do you recall?
>
> [VARGAS:] Maybe two months ago.
>
> [STATE:] And were you honest at that time?
>
> [VARGAS:] Yes, ma'am.

VRP (Sep. 11, 2024) at 238-39.

### b.    Poole Testimony

Poole testified that after he came home from the casino and got into bed, Vargas leaned over Poole and began hitting him in the face with her cellphone.  Poole moved Vargas away and got on top of her on the bed.  Poole told Vargas to drop her phone, pressing on her neck as he did so.  Vargas then dropped her phone.  Poole picked up her phone and then pulled Vargas up from the bed.  Vargas requested her phone back, and Poole gave it to her.  Vargas then fled the house.

On cross-examination, the State asked Poole about his conversation with Sergeant Reynolds.  Poole did not recall statements he made to Sergeant Reynolds.  However, Poole recalled demonstrating a cross-collar choke to Sergeant Reynolds to show how he had held Vargas.

On re-direct, defense counsel sought to clarify the discrepancies in Poole's testimony.  Poole stated that he did not remember the full conversation he had had with Sergeant Reynolds and had not informed Sergeant Reynolds that Vargas hit him in the face with her phone because

he "was afraid that [the police] would arrest her." VRP (Sep. 12, 2024) at 380. Defense counsel then asked, "Have you been truthful in your testimony today?" VRP (Sep. 12, 2024) at 380. The State objected, and the trial court sustained the objection.

c. Deputy Nault testimony

Deputy Nault testified to the events following law enforcement's arrival at Poole and Vargas' residence. On direct examination, Deputy Nault initially referred to Vargas as "the female" before the State began referring to Vargas by her name. VRP (Sep. 11, 2024) at 261.

The State asked several questions of Deputy Nault regarding his observations of the scene and Vargas' injuries. The State also introduced several photos—photos that Deputy Nault had taken—into evidence as exhibits. The State asked Deputy Nault exhibit by exhibit what the photos depicted:

> [STATE:] Now to Exhibit 13, what's depicted in this photograph?
>
> [DEPUTY NAULT:] That is the—a photograph of the tire tread from the [furniture dolly] onto the side of the victim's truck.
>
> [STATE:] Do you know it's the tire tread or did you just suspect it was?
>
> [DEPUTY NAULT:] I suspect it's the tire tread.

VRP (Sep. 11, 2024) at 272.

On cross-examination, defense counsel also asked Deputy Nault about his observations, the timeline of events, and the specifics of his conversations with Vargas. Deputy Nault testified that toward the end of his contact with Vargas, Deputy Nault retrieved a domestic violence resources pamphlet to give to her.

> [DEFENSE COUNSEL:] And then did—did you have a third brief conversation with Ms. Vargas?

6

[DEPUTY NAULT:] Yes. As typical, we discuss safety planning and that kind of thing with victims.

[DEFENSE COUNSEL:] Okay. So it would be accurate to say that you spoke with Ms. Vargas three separate times?

[DEPUTY NAULT:] Yes.

VRP (Sep. 11, 2024) at 280.

2. Verdict and Sentencing

The jury found Poole guilty of second degree assault and that Poole and Vargas were intimate partners for the purposes of the DV allegation. However, the jury found Poole not guilty of the charge of interfering with reporting of domestic violence.

The trial court sentenced Poole to a low-end standard range sentence of 3 months, with 12 months of community custody.

Poole appeals.

## ANALYSIS

Poole raises several challenges on appeal. Specifically, Poole alleges improper witness opinion testimony, prosecutorial misconduct for "preemptive bolstering" of a witness's credibility, and ineffective assistance of counsel for defense counsel's failure to object to the two aforementioned items. Br. of Appellant at 2. Finally, Poole alleges cumulative error deprived him of a fair trial. Poole's challenges fail.

No. 60152-4-II

A.     IMPROPER WITNESS TESTIMONY[1]

     1.     Legal Principles

"The right to have factual questions decided by the jury is crucial to the right to a jury trial." *State v. Bass*, 18 Wn. App. 2d 760, 796, 491 P.3d 988 (2021), *review denied*, 198 Wn.2d 1034 (2022); U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 21, 22. Thus, witnesses may not testify to an opinion regarding a defendant's guilt, whether directly or by inference. *Bass*, 18 Wn. App. 2d at 796. Further, a witness's expression of personal belief as to the intent of the accused or veracity of other witnesses is also inappropriate. *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). "Testimony deemed to be an opinion as to a defendant's guilt must relate to the defendant." *State v. Wilber*, 55 Wn. App. 294, 298, 777 P.2d 36 (1989).

Generally, appellate courts will not consider issues raised for the first time on appeal. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). A party may raise an error for the first time on appeal if it is a manifest error affecting a constitutional right. RAP 2.5(a)(3). "The defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial." *Kirkman*, 159 Wn.2d at 926-27. This means that the error must have "caused actual prejudice or practical and identifiable consequences" at trial. *Montgomery*, 163 Wn.2d at 595.

---

[1] In Poole's assignments of error, his challenge regarding the alleged improper witness opinion testimony is couched within the prosecutorial misconduct assignment of error. However, in his argument section regarding the improper witness opinion testimony, Poole does not argue that the alleged improper witness opinion testimony was prosecutorial misconduct. Thus, this opinion does not address the issue of the alleged improper witness opinion testimony as a prosecutorial misconduct claim.

Witness opinion testimony is not automatically reviewable as a manifest constitutional error. *Kirkman*, 159 Wn.2d at 936. To constitute a manifest error, there must be "a nearly explicit statement by the witness that the witness believed the accusing victim." *Id.* Further, in assessing whether opinion testimony prejudiced a defendant, courts will also consider whether the jury was properly instructed. *Montgomery*, 163 Wn.2d at 595.

2.    Poole Failed to Preserve Issue on Appeal

Poole argues that Deputy Nault improperly identified Vargas as a "'victim'" twice in his testimony and that doing so was "unfairly prejudicial" because an implication arises that Deputy Nault believed Poole had committed a crime. Br. of Appellant at 8, 10. Although Poole did not object to Deputy Nault's use of the word "victim" at trial, he now urges this court to review his claim as a manifest constitutional error.

The State, conversely, urges this court to decline review of this issue because Poole failed to preserve the issue for review and fails to demonstrate a manifest constitutional error. The State also asserts that even if we review the merits of Poole's claim, there was no improper opinion testimony. We agree with the State that Poole has failed to demonstrate a manifest error affecting a constitutional right and decline to review Poole's argument raised for the first time on appeal.

Here, the record shows that Deputy Nault twice used the word, "victim," during his testimony. The first use of "victim" was in reference to a photo exhibit—Deputy Nault stated: "That is . . . a photograph of the tire tread from the [furniture dolly] onto the side of the victim's truck." VRP (Sep. 11, 2024) at 272. Deputy Nault's second use of "victim" was during cross-examination, when defense counsel asked Deputy Nault about a third conversation Deputy Nault had with Vargas, and Deputy Nault replied, "As typical, we discuss safety planning and that kind

9

of thing with victims." VRP (Sep. 11, 2024) at 280. Defense counsel did not object in either circumstance. At all other times during Deputy Nault's testimony, Deputy Nault referred to Vargas by her name or as "the female." VRP (Sep. 11, 2024) at 261.

Poole argues that Deputy Nault's use of "victim" indicated that Deputy Nault "had formulated an opinion of [guilt by labelling Vargas as] the victim and [Poole as] the aggressor," thus making it a manifest constitutional error. Br. of Appellant at 14. In the first instance, it is evident Deputy Nault meant Vargas when he said "victim." VRP (Sep. 11, 2024) at 272. However, his use of "victim" was to identify the owner of the truck in a photo exhibit and was not used in an expression of personal belief or guilt. In the second instance, Deputy Nault used the term "victims" more generally and in reference to standard law enforcement protocol when responding to domestic violence incidents. VRP (Sep. 11, 2024) at 280. Again, Deputy Nault was not expressing an opinion as to who he believed or whether he thought Poole had committed a crime. Deputy Nault was aware that Vargas was the 911 caller and that he was responding to a domestic violence situation. When viewed in context, the record shows that Deputy Nault more likely used the term "victim" to identify the complaining witness or the 911 caller. Thus, there was no explicit or nearly explicit statement from Deputy Nault that he believed Vargas over Poole. *Kirkman*, 159 Wn.2d at 936.

Furthermore, the record shows the jury was properly instructed. *Montgomery*, 163 Wn.2d at 595. Instruction No. 1 instructed jurors that they were "the sole judges of the credibility of each witness" and provided a list of factors for jurors to contemplate when considering a witness's testimony, such as a witness's personal interest or bias or prejudice. CP at 90. Jurors are presumed to follow the court's instructions absent evidence to the contrary. *Montgomery*, 163 Wn.2d at 596.

Indeed, the jury acquitted Poole of his charge of interfering with reporting domestic violence. Thus, even if there was improper opinion testimony, Poole fails to establish a manifest error. *Kirkman*, 159 Wn.2d at 936. Because he fails to establish a manifest error, Poole has failed to preserve his challenge for review.

B.     PROSECUTORIAL MISCONDUCT

1.     Legal Principles

Defendants who allege prosecutorial misconduct must establish the prosecutor's improper conduct and resulting prejudice. *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003). It is misconduct for a prosecutor to personally vouch for a witness's credibility. *State v. Molina*, 16 Wn. App. 2d 908, 919, 485 P.3d 963, *review denied*, 198 Wn.2d 1008 (2021). "'Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony.'" *Id.* (quoting *State v. Coleman*, 155 Wn. App. 951, 957, 231 P.3d 212 (2010), *review denied*, 170 Wn.2d 1016 (2011)).

Additionally, the State generally may not bolster a witness's credibility prior to any attempted impeachment. *State v. Hakimi*, 124 Wn. App. 15, 24, 98 P.3d 809 (2004), *review denied*, 154 Wn.2d 1004 (2005). Bolstering occurs when evidence or corroborating testimony is presented to support the credibility of the witness. *State v. Bourgeois*, 133 Wn.2d 389, 401, 945 P.2d 1120 (1997). However, if the witness's credibility is "'an inevitable, central issue'" during trial, then the corroborating testimony or evidence may be offered. *Hakimi*, 124 Wn. App. at 24 (quoting *State v. Petrich*, 101 Wn.2d 566, 575, 683 P.2d 173 (1984), *abrogated on other grounds by State v. Kitchen*, 110 Wn.2d 403, 406, 756 P.2d 105 (1988)). Any alleged improper statements are

viewed "'within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions.'" *Molina*, 16 Wn. App. 2d at 918 (quoting *Dhaliwal*, 150 Wn.2d at 578).

Once a defendant establishes improper conduct, courts must determine if the defendant was prejudiced by the improper conduct. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). "'Prejudice' means that there is a substantial likelihood that the misconduct affected the jury's verdict." *State v. Zwald*, 32 Wn. App. 2d 62, 74, 555 P.3d 467 (2024), *review denied*, 4 Wn.3d 1005 (2025). If "a defendant does not object to the alleged misconduct below, he waives any error on appeal unless he can show that the conduct was 'so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury.'" *Id.* (internal quotation marks omitted) (quoting *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011)).

2.      No Improper Conduct

Poole argues that the State's "repeated question" to Vargas on direct examination as to whether she was honest "improperly bolstered her credibility." Br. of Appellant at 15. Specifically, Poole asserts that Vargas, as the State's first witness, had not been impeached and nothing in evidence at that time had "opened the door" for the State to "preemptively rehabilitate" Vargas as a witness. Br. of Appellant at 15. We disagree.

Here, Poole alleges two instances of misconduct. The first instance was the State's question regarding whether Vargas was honest when she spoke with law enforcement after they responded to her 911 call:

> [STATE:] Do you recall how you were feeling at the time you gave the statement to law enforcement?
>
> [VARGAS:] Yeah, scared. I was in pain. My throat was hurting.
>
> [STATE:] Were you honest with the police?
>
> [VARGAS:] Yes, ma'am.

VRP (Sep. 11, 2024) at 237. The second instance, a few moments later during Vargas' direct examination, occurred as follows:

> [STATE:] And then do you recall several months later giving another statement about what happened to [defense counsel] and her staff?
>
> [VARGAS:] Yes, ma'am. I remember meeting with her.
>
> [STATE:] And when did that occur, do you recall?
>
> [VARGAS:] Maybe two months ago.
>
> [STATE:] And were you honest at that time?
>
> [VARGAS:] Yes, ma'am.

VRP (Sep. 11, 2024) at 238-39.

The record shows that Poole did not object to the State's line of questioning. Thus, he waives any error on appeal absent a showing of misconduct so flagrant and ill-intentioned that it causes incurable prejudice. *Zwald*, 32 Wn. App. 2d at 74. Poole argues that the State's conduct was flagrant and ill-intentioned because when defense counsel asked a purportedly similar question about Poole's honesty, the State immediately objected, and the trial court sustained the objection.[2]

---

[2] We note that Poole does not challenge on appeal the trial court's ruling sustaining the State's objection.

A review of the record shows that defense counsel's question to Poole, to which the State objected, was different than the prosecutor's questions to Vargas that Poole challenges on appeal. In Poole's case, during redirect examination, defense counsel asked clarifying questions of Poole in terms of what he recalled telling Sergeant Reynolds and comparing it with the testimony he provided in trial. Defense counsel then asked Poole, "Have you been truthful in your testimony *today*?" VRP (Sep. 12, 2024) at 380 (emphasis added). This question is distinctly different than the prosecutor's questions to Vargas regarding Vargas' *past interviews*, which had not been under oath and had occurred in very different circumstances. For instance, Vargas testified that she was feeling scared when she spoke with law enforcement. It is not unreasonable for an individual experiencing fear to not be entirely forthcoming when speaking with law enforcement, especially in a domestic violence context. For the State to ask whether Vargas had been honest at the time she spoke with law enforcement is reasonable in light of the issues in the case and the evidence discussed above. *Molina*, 16 Wn. App. 2d at 918. The same analysis applies to the second instance when the State asked about Vargas' honesty. Nothing in the State's line of questioning suggests flagrant or ill-intentioned conduct. Thus, Poole has waived any error on appeal. *Zwald*, 32 Wn. App. 2d at 74.

Even if Poole had not waived the error on appeal, the record does not support Poole's contention. The State simply asked Vargas whether she had been honest in two prior interviews, which, for the reason discussed above, was not inappropriate. *Molina*, 16 Wn. App. 2d at 918. In each case, immediately after the question, the State moved on to other topics. The prosecutor did not express a personal opinion, vouch for Vargas' credibility, or allude to facts not in evidence. *Id.* at 919.

Furthermore, Vargas' credibility was an inevitable, central issue during trial. *Hakimi*, 124 Wn. App. at 24. Vargas and Poole were the only two witnesses to the incident, and the jury's determination of facts hinged on who they found more credible. On cross-examination, defense counsel called into question the strength of Vargas' memory of the incident. Vargas admitted to not remembering several things, or in some cases offered testimony contradictory to that of other State witnesses. The record also shows that the jury was properly instructed to be "the sole judges of the credibility of each witness." CP at 90. Again, "[w]e presume the jurors followed the court's instructions." *Molina*, 16 Wn. App. 2d at 919. The jury had the benefit of hearing competing versions of events from various witnesses, and moreover, whether Vargas was honest in prior interviews would have little to no bearing on whether she was honest during trial.

Therefore, viewing the context of the prosecutor's questioning, the issues in the case, the evidence discussed in the argument, and the jury instructions, the record shows that the prosecutor's questions to Vargas regarding her honesty in prior interviews were not improper. *Id.* at 918.[3] Accordingly, Poole's claim of prosecutorial misconduct fails.

C.    INEFFECTIVE ASSISTANCE OF COUNSEL

1.    Legal Principles

Criminal defendants are guaranteed the right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). We presume counsel is effective. *Vazquez*, 198 Wn.2d at 247. We review ineffective assistance of counsel claims de novo. *Id.* at 249.

---

[3] Because the questions were not improper, we do not address prejudice. *See Emery*, 174 Wn.2d at 760.

"To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation was deficient, . . . and (2) defense counsel's deficient representation prejudiced the defendant." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "If one prong of the test fails, we need not address the remaining prong." *State v. Crow*, 8 Wn. App. 2d 480, 507, 438 P.3d 541, *review denied*, 193 Wn.2d 1038 (2019).

Counsel's performance is deficient if it falls below "'an objective standard of reasonableness based on consideration of all the circumstances.'" *Vazquez*, 198 Wn.2d at 247-48 (quoting *McFarland*, 127 Wn.2d at 334-35). "'[T]he defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" *Id.* at 248 (quoting *McFarland*, 127 Wn.2d at 336). Trial tactics include when and how an attorney decides to object during trial testimony. *Id.* A counsel's decision to forego an objection may be a legitimate trial tactic if counsel wishes to avoid highlighting certain evidence. *Crow*, 8 Wn. App. 2d at 508.

Counsel's deficient performance prejudices a defendant if "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *McFarland*, 127 Wn.2d at 335. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017).

To prevail on a claim of ineffective assistance based on counsel's failure to object, the defendant must show that an objection would likely have succeeded. *Vazquez*, 198 Wn.2d at 248. "Only in egregious circumstances, on testimony central to the State's case, will the failure to object constitute incompetence of counsel justifying reversal." *Crow*, 8 Wn. App. 2d at 508.

2. Failure to Object to Identification of Vargas as a Victim

Poole argues he received ineffective assistance of counsel because defense counsel did not object to Deputy Nault's reference to Vargas as a "victim." Br. of Appellant at 19. We disagree.

Poole asserts "there was no strategic reason not to object when Deputy Nault identified Ms. Vargas as the victim." Br. of Appellant at 20. Here, as discussed above, Deputy Nault's first use of "victim" was in his identification of Vargas' truck in a photo exhibit. The State asked Deputy Nault to identify a photograph, one which Vargas herself was not pictured in. In the second instance, Deputy Nault referred to "victims" generally as he described standard law enforcement protocol when responding to incidents of domestic violence. However, the record shows that Deputy Nault referred to Vargas by her name or as "the female" throughout his testimony. VRP (Sep. 11, 2024) at 261. While it could be inferred that Deputy Nault included Vargas under the category of "victims," the record also shows that Deputy Nault was aware that Vargas was the 911 caller and that he was responding to a domestic violence incident. Accordingly, in context, as discussed above, Deputy Nault more likely used the term "victim" to mean the complaining witness or the 911 caller. Overall, Deputy Nault's use of "victim" and "victims" were fleeting. Further, the State never once referred to Vargas as a victim. Thus, defense counsel could reasonably have chosen not to object so as not to draw attention to the reference. *Crow*, 8 Wn. App. 2d at 508.

Because defense counsel's lack of objection to Deputy Nault's use of "victim" could have been a legitimate trial tactic, we hold defense counsel did not perform deficiently.[4] Accordingly,

---

[4] Because Poole fails to establish deficient performance, we do not address prejudice arising from defense counsel's failure to object to Deputy Nault's use of the word, "victim." *Id.* at 507.

Poole's ineffective assistance of counsel claim based on the failure to object to the term "victim" fails.

> 3.      Failure to Object to State's Inquiry Regarding Vargas' Honesty

Poole argues "there was also no strategic reason not to object to the State's inquiry with Ms. Vargas whether she was being honest." Br. of Appellant at 20-21. Poole contends that because the trial court sustained the State's objection when defense counsel asked Poole about Poole's honesty, the trial court would have sustained an objection from defense counsel had defense counsel raised one when the State asked Vargas about her honesty. Poole asserts that "[p]ermitting the State to bolster a witness whose credibility had not been attacked was not a tactical decision and appears to have been an oversight." Br. of Appellant at 21. We disagree.

Poole's argument ignores the fact that the State's questions to Vargas regarding Vargas' honesty in two specific *past interviews* were fundamentally different from defense counsel's question to Poole regarding his honesty *during trial*. Further, Poole does not identify on what grounds an objection from defense counsel would have been sustained. Indeed, for the reasons discussed in the preceding section, the State did not improperly bolster Vargas' credibility. Thus, it is not clear from the record that an objection would have succeeded. *Vazquez*, 198 Wn.2d at 248. Furthermore, Poole makes no argument as to how defense counsel's failure to object to the State's line of questioning prejudiced him.

Even assuming Vargas' testimony about her honesty during two past interviews was inadmissible and that defense counsel performed deficiently for failing to object, reversal is required *only if* the outcome of the proceedings would have been different without the inadmissible evidence. *Id.* at 248-49. Here, based on the evidence presented at trial, a reasonable jury could

still have found Poole guilty for second degree assault beyond a reasonable doubt. For instance, the jury saw photographic evidence of Vargas' injuries. Poole himself testified to "pressing on [Vargas'] neck." VRP (Sep. 12, 2024) at 350. Sergeant Reynolds testified to, and the jury was shown body camera footage of, Poole telling Sergeant Reynolds that he held Vargas in a cross-collar choke, which was an army combat maneuver. Accordingly, even if counsel performed deficiently for failing to object to the State's questions about Vargas' honesty, Poole fails to establish prejudice. Because Poole fails to establish prejudice, his claim of ineffective assistance fails.

D.    CUMULATIVE ERROR

Poole argues that he should receive a new trial because "the combination of errors deprived him of a fair trial." Br. of Appellant at 21. We disagree.

"'The cumulative error doctrine applies where a combination of trial errors denies the accused of a fair trial, even where any one of the errors, taken individually, would be harmless.'" *State v. Azevedo*, 31 Wn. App. 2d 70, 85, 547 P.3d 287 (2024) (quoting *In re Pers. Restraint of Cross*, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018), *and by State v. Magaña Arévalo*, 5 Wn.3d 781, 582 P.3d 330 (2026)). Here, for the reasons discussed in the analyses above, there is no combination of errors to merit application of the cumulative error doctrine. *Id.* Therefore, there is no cumulative effect of errors that deprived Poole of a fair trial.

No. 60152-4-II

CONCLUSION

We affirm Poole's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Veljacic, C.J.

Che, J.

20